Case No. 1:11-CR-00897 3/31/2014

Dear Clerk of the Court:

Attached Please find my Motion For A Compassionate Release/ Sentence Reduction in light of The Cares Act, The First Step Act and 18 U.S.C. § 3582(c)(1)(A).

Once filed, please make me a copy for my records and a copy for the U.S. Attorney's office due to the fact that we are still on a lock-down status since March 2020 (almost a year) due to the COVID-19 crisis.

Thank you for your valued help and time in this pertinent matter. God

Sincerely, Maur ahulu

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

MANSSOR ARBABSIAR, §

    Petitioner, §

v. §

               CASE NO. 1:51-11-CR-00897-001

UNITED STATES OF AMERICA, §

    Respondent: §  HONORABLE JUDGE KEENAN
                   §          PRESIDING

## MOTION TO MODIFY AND/OR REDUCE A TERM OF IMPRISONMENT PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) AND IN LIGHT OF THE FIRST STEP ACT / THE CARES ACT

COMES NOW, Petitioner, Manssor Arbabsiar, acting in pro per (pro se), respectfully submits this Motion to Modify and/or Reduce a Term of Imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) and in light of the First Step Act signed into law by President Trump on December 21, 2018. Petitioner further prays that this Court construe this pleading liberally in light of Haines v. Kerner, 404 U.S. 519, 520-21 (1972), holding that, "pro se litigants are to be held to a lesser standard of review than lawyers who are formerly trained in the law, and are entitled to a liberal construction of their pleadings."

### FACTS

1) Petitioner is currently incarcerated at the FCC-Yazoo City Medium Facility in Yazoo City, Mississippi.

2) Petitioner was convicted of Murder For Hire, in violation 18 U.S.C. § 1958; Conspiracy to Commit Murder For Hire, violation of 18 U.S.C. § 1958; and Conspiracy to commit an Act of Terrorism, in violation of 18 U.S.C. 31. Petitioner was sentenced to 300 months (25-years) as result of stacked sentences (consecutive) of ten-years ten-years + five-years or twenty-five years.

3) During Petitioner's term of incarceration, numerous cases in the Supreme Court, Amendments with the Sentencing Commission, and a plethora of case law in various circuits and district courts have been ruled on that Petitioner has been unable to participate, use as current case law for filing(s) in this Court, and/or take advantage of in getting relief from his $\underline{300}$ month term of imprisonment.

4) Petitioner is aware that had he been sentenced today under today's sentencing regime, Petitioner's sentence would be substantially lower.

5) On December 21, 2018, President Trump signed into law the First Step Act that allowed not only Congress to rectify wrongs in an unjust and unfair judicial system, sending fewer people to prison, imposing shorter sentences for drug crimes, and reducing the disparity between crack and powder cocaine offenses. First Step Act and the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (2010)("the Fair Sentencing Act").

6) An extra year, day or moment of freedom from prison, when warranted, is worth pursuing by Petitioner, and, if justified by the law, should be granted by the court.

7) The First Step Act has now given judges broader discretion and has changed to process case reviews around judicial consideration of sentence modifications and/or reductions under 18 U.S.C. § 3582(c)(1)(A).

8) With this broader discretion, Petitioner can now bring a request to "modify/reduce a term of imprisonment" directly to the sentencing court (rather than a need to have the motion brought by the Bureau of Prisons) based on the claim that "extraordinary and compelling reasons warrant such a reduction."

9) In light of the First Step Act giving judges a broader discretion, Congress can now only formally require a judge to find "extraordinary and compelling reasons to warrant such a reduction."

10) With this valuable and critical new mechanism and vehicle to reduce problematic prison sentences under 18 U.S.C. § 3582(c)(1)(A) in any and every case in which a defendant presents "extraordinary and compelling reasons" to support sentence modifications and/or reductions, already numerous judges have found notable reasons sufficient to reduce a sentence while making clear that the new First Step Act allows a judge broad authority to "determine whether any extraordinary and compelling reasons" justified a reduction in a prison term. See U.S. v. Cantu, No. 1:05-cr-458-1 (S.D. Texas 6/17/2019)(finding extraordinary that government release to home confinement); see also, U.S. v. Cantu-Rivera, No. H-89-204, 2019 (S.D. Texas 6/24/2019)(finding First Step Act (amendment of Life sentences) supported finding of "extraordinary and compelling reasons"); U.S. v. Johns, No. CR-91-392-TUC-CKJ (N.Ariz. 6/27/2019); U.S. v. Beck, No. 1:13-cr-186-6 (M.D.N.C. 6/28/19)(where the judge authored a lengthy explanation for her reduction of the sentence to time served) ✱

THEREFORE, based on the foregoing, Petitioner respectfully submits the following extraordinary and compelling reasons to warrant relief by a modification and/or reduction of his sentence:

✱ Note: Attached is Petitioner's attempt(s) to exhaust his Remedy(ies) with the Warden. See Exhibit 1.

-4-

## I. COVID-19 CRISIS

In light of the global pandemic of the COVID-19 coronavirus, the Yazoo City Medium has been on a locked-down/Quarantined status since March 20, 2020, over 48+weeks. The lock-down has impeded Manssor and/or prevented Manssor any access to:

1) the law library;
2) typewriters;
3) copy machines;
4) limited access to Staff UNIT Team;

and    5) serious delays with both incoming and outgoing mail.

THEREFORE, this petition/Motion is A) legi_ hand-written; B) the original and only copy_ Manssor will request that the Clerk make a cop_ serve the U.S. Attorney's Office; and a copy for h_ for his file; and c) due to mail delays, Manssor w_ invoke the mailbox rule as to his filing responses/rebu_

A. YAZOO CITY CANNOT PROTECT MANS_
OR PROVIDE AN ACCEPTABLE LE_
OF CARE —

Manssor's immunocompromised health i_ consist of an immune deficiency caused by yea_ smoking, BMI (Body Mass Index) of 30+, an_ history of high blood pressure. At the age of 66_ means that Manssor must do more than the aver_ protect himself from the dangers of COVID-19. th_

-5-

neither Manssor nor the BOP (Bureau of Prisons) are able to adequately protect Manssor while he remains incarcerated at Yazoo City.

B. YAZOO CITY HAS CLEARLY DEMONSTRATED THAT IT IS UNABLE TO FOLLOW ITS OWN PROCEDURES OR FOLLOW CDC GUIDELINES INCLUDING PROVIDING ANY ADEQUATE PROTECTION FOR MANSS

Yazoo City has been on lock-down since March 20, 2020. The lock-down was due to the fact th six inmates who worked in UNICOR became infe by their foreman (staff), who was infected. Tho six inmates were housed in the same USIT as Mans Yazoo City's Asymptomatic and Symptomatic Quarant policies reflects the dangers of COVID-19 in correc facilities. Yazoo City's response, however, when six inmates became deathly ill, exposing all inma in D-1 and those that worked at UNICOR, reflec reality. With Yazoo City unable to protect Man: from potential exposure to the novel coronavirus, t leaves Manssor trapped in a COVID-19 tinderbox.

Yazoo City's Asymptomatic Quarantine Polic requires the institution to take certain measu when a prisoner is exposed to a COVID-positiv person in order to protect against an uncont COVID-19 outbreak, including adopting stan contact and droplet precautions with eye: placing exposed individuals in a "single cell," a implementing "social distancing measures." If a becomes symptomatic after a potential COVI

—6—

exposure, Yazoo City's symptomatic policy requires "promptly" reporting the case to leadership, wearing an N-95 mask during interaction with the prisoner, moving the symptomatic prisoner to a certified Airborne Infection Isolation Room, eliminate any personal contact or interacting with the inmate, and making preparations in the event the inmate must be transferred to the hospital in case of an emergency.

None of these measures were followed when the entire Unit (D-1), where Manssor was housed and still remains housed, was exposed by six COVID-19 positive indivuals in March of this year. When inmates began showing symptoms, fever, headaches, congestion, days later medical went through the Unit testing all inmate temperatures. All inmates remained in their cells, including those with COVID-19 with their cellies. It took weeks later, when two inmates were taken to the hospital, that those with symptoms were moved to be quarantined. Not one of Yazoo City's symptomatic Quarantine measures were implemented.[1]

Yazoo City has prior failures and history of not following their own protocol for infectious diseases outbreaks. In September of 2018, one inmate, Michael Jones, who had a medical recorded history of T.B. (Tuberculosis Bacilli), was allowed

_____

[1] One of Manssor's major concerns is that Yazoo City does not differentiate between high and low risk individuals

-7-

to work as a cook for Food Service, preparing inmate meals, and began complaining about chest pains.

On September 26, 2018 an X-ray of Michael Jones' chest, was clearly misread/mis-diagnosed. See Attachment Z — chest X-Ray. Any "real" doctor and all lung experts all know that 1) pneumonia is too heavy and would be impossible to be in the upper lungs; and 2) any patchy airspace consolidation in the right upper lung, can be only one thing — T.B. T.B. resides in the right upper lung. Inmate Jones was active with T.B. that resulted in over 1,000 inmates and staff being exposed to T.B and even worse, over 150+ inmates became infected with T.B, including numerous staff.

Not only did Yazoo City completely disregard any infectious disease outbreak protocol; 1) they lied to local Mississippi Health and OSHA departments; 2) no masks were passed out at all; 3) Quarantine was just to keep inmates in the UNITS, but allowed inmates to go to chow and recreation; 4) staff was allowed in and out of the compound-none were Quarantined; 5) Visits and Transfers continued and there was no HAZMAT Clean-up done at all in Food Service, where Jones worked, in the Unit (F-3) where Jones resided, or even Jones' cell where he lived. This became one of the big BOP cover-ups that Washington, D.C. sent numerous Medical staff to help with the cover testing all inmates, and supplying daily medi-

-8-

to all those 150+ inmates that were infected. To make matters worse, several inmates were transferred during the outbreak that caused other Institutions to become completely shut down; and during that time-frame, Jackson School District had a T.B outbreak that due to staff going in and out and still conducting visits, it doesn't take a rocket science to figure out what happened.

With Yazoo City's prior debacle and history of failure to follow their own procedures, has caused Manssor serious concerns. Harvard University researche have concluded that after adjusting Manssor's age, sex, body mass index, health issues with Manssor's immune deficiencies, and a history of high blood pressure, increases the risk of severe COVID-19 by as much as 48%.[2]

The "CDC (Center For Disease Control) Guide Lines note that many BOP Facilities create a "heightened risk of danger to inmates due to a low capacity for patient volume, insufficient Quaran space, insufficient on-site medical staff, highly congretional environments, and limited ability of incarcerated persons to exercise effective disea prevention measures. See Brandan Saloner, Kali Parish, Julia A. Ward, et. al, COVID-19 cases and deaths in Federal and State prisons-JA (7/18/2020). This is why Yazoo City has been o a locked-down status since March 20, 2020 (H&t w

─────────────────────

[2] Chris Sweeney - Increased risk of severe COVID-19
Harvard School of Public Health (2020).

-9-

Manssor was not sentenced to a death sentence. Manssor was also not sentenced to be placed in a facility that puts his health, safety, security at severe risk or even death. And finally, Manssor was not senteced to a harsh treatment of being locked-down 23-hours a day violating his Due Process Protections and Liberty of Interest. Jackson, 864 F.2d 1235, 1250 (5th Cir. 1989); 28 C.F.R. § 345.12(d); Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); Wolff v. McDonnell, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935.

THEREFORE, it goes without saying, that in the midst of a highly contagious respiratory infection, Manssor's medical needs would be far better served outside of the densely-packed, under resourced environment of Yazoo City, locked-down 23-hours a day with no programming, in a prison that is at significant risk of a serious COVID-19 outbreak.

## C. YAZOO CITY RECENT OUTBREAK

On October 29, 2020, six staff and 15 inmates became positive with COVID-19. This caused the lock-down of 23-hours a day to become stricter/harsher by only allowing inmates, 5 cells at a time, 30-minutes to shower, make phone-calls on Monday, Wednesday and Friday. Every other day, lock-down 24-hours. Within two weeks, the amount rose to over 150+ inmates and a dozen staff. This

-10-

tinderbox explosion caused two units to be completely shut down, lack of staff, and prevents most staff from entering any of the units. Manssor now pleads for a Compassionate Release.

## II. THE SENTENCING FACTORS WEIGH IN FAVOR OF MANSSOR'S RELEASE —

The relevant sentencing factors in 18 U.S.C. §3553(a) further support granting Compassionate Release to Manssor who has already served more than 114 months (almost 10 years) of his 300-month sentence. Manssor's current release date is August of 2032 to a six-month half-way house (RRP) program. (Note: If the BOP grants him a two-year half-way house, Manssor could be released as early as February of 2031). In ruling on a Motion for Compassionate Release, the Court should consider the factors set forth in 18 U.S.C. § 3553(a) that are applicable. 18 U.S.C. § 3582(c)(1)(A). In revisiting this evaluation after a sentence has been initially imposed, the Court must evaluate "the most-up-to-date picture" of Manssor's characteristics and circumstances, including any that have changed since Manssor's original sentence. Pepper v. U.S, 562 U.S. 476, 492 (2011). Considering the "most-up-to-date picture," which now includes the current and on-going COVID-19 crisis and Manssor's post-sentencing rehabilitation efforts while incarcerated, each of the § 3553(a) factors counsels in favor of reducing Manssor's sentence to time served or an immediate release.

## A. POST-SENTENCING REHABILITATION

In a recent ruling in the Supreme Court in <u>Pepper v. U.S.</u>, No. 09-6822, and in conjunction with the <u>18 U.S.C. § 3553(a)</u> sentencing factors, Congress has now instructed that: "evidence of post-sentencing rehabilitation may be highly relevant to several of the <u>§ 3553(a)</u> factors where District Courts can and may consider at sentencing and/or for resentencing. 18 U.S.C. § 3582(c)(i)(A); U.S. v. Holloway, 68 F. Supp. 3d 310 (E.D. N.Y. 2014). Petitioner has attached his Program Review and some Certificates that consist of his programming, schooling, employment, etc., of his participation and involvement with numerous activities that have been offered at the Federal Bureau of Prisons during his time of incarceration. This exemplary post-sentencing conduct may also be taken into consideration as the most accurate indicator of "his present purposes/ intentions and/or tendencies to change/rehabilitate himself in his plans and motives upon release from prison/custody. See Attachment 3. see also <u>Ashe</u>, 302 U.S. at 55. Petitioner has also been an examplar to both inmates and Staff with his conduct as an incarcerated inmate.

<u>Accordingly, evidence of Petitioner's post-sentencing rehabilitation bears directly on the District Court's overarching duty to impose a sentence and/or new sentence</u>, but not greater than necessary to serve purposes of sentencing/resentencing, in which, <u>the Court may deem just and proper in GRANTING more relief.</u> 18 U.S.C. § 3553(a). Mansor can establish that he is no longer that person that this Court convicted almost 10 years ago, no longer a danger to his community, and no longer a threat to society. <u>Attachment 3.</u>

-11-

-12-

B. THE SENTENCE MANSSOR HAS ALREADY SERVED MORE THAN REFLECTS THE SERIOUSNESS OF HIS OFFENSE —

The almost ten (10) years that Manssor has already served in Federal Prison are more than sufficient to reflect the seriousness of the non-violent conspiracy counts to which Manssor pled guilty to. See, e.g., U.S. v. Pabon, ___ F.Supp.3d ___, 2020 WL 2112165, at *8 (E.D. Pa 5/4/2020) (explaining that "nearly 14 months in prison" combined with "Supervised Release" and "a myriad of collateral consequences" would "promote respect for the law and provide just punishment" in a serious drug case).

While the Court considered Manssor's original sentence of 25-years (stacked) incarcerab[le] appropriate at time of his sentence, it would n[ot] be an excessive sentence now that it carries with it additional penalties as to a high risk of Manssor's health, illness, or even death; and the fact of being locked down for over 48 weeks wit[h] no programming, no recreation, no visitation, only out for 30 minutes to an hour, Monday, Wednesday, Frida[y] to shower and/or use the phone. See, e.g., U.S. v. Mas[sor,] No. 3:11-cr-104 CWR-LRA-3  2020 WL 3065303, at *3 (S.D. Miss 6/9/2020) ("[I]n this unusual circumstance once unknowable [at the time of sentencing] a "just punishment" for [the Defend[ant] is one with less risk to health, illness, or death than the status quo currently offers hi[m]"

-13-

Notably, the current risk at issue with the COVID-19 crisis, the lock-down status, the time that Mansoor has already served of nearly ten-years, and the fact that Mansoor had no prior criminal history, far exceeds many times over the sentence he would have received under today's regime or had been prosecuted in State Court. See, e.g., Bureau of Justice Stats, Time Served in State prisons 2018 (Nov. 2018); see also U.S. v. Vigneau, C.R No. 97-cr-33-JJM-LDA, 2020 WL 4345105 (Dist. R.I. / 8-2020)(noting median lengths of sentences imposed in 2019 for a selection of especially heinous crimes: 20-years for murder; 15-years for sexual abuse; 10-years for "kidnapping.")

A reduced sentence, thus, comports with the fundamental purpose of the Sentencing statute "to avoid unwarranted sentence disparities" among similarly situated defendants. 18 U.S.C. § 3553 (a)(6); See U.S. v. Johnson, No. H-96-176, 2020 WL 3618682, at *3 (S.D. Texas 7/2/2020)(discussing need to "avoid sentencing disparities" and "granting compassionate release."), U.S. v. Parker, ___ F.Supp.3d ___, 2020 WL 2572525, at *13 (C.D. Cal 5/21/2020)(granting compassionate release to life-sentenced defendant in part because of sentencing disparities); U.S. v. Brown, ___ F. Supp. 3d ___, 2020 WL 2091802, at *10 (S.D. Iowa 4/29/2020)(that co-defendants were release several years ago - "cuts in favor of release.")

Mansoor acknowledges that he requests for a reduction in the length of his term of incarceration but to meet the challenges caused by this COVID-19 global pandemic, courts around the country, including

14

district courts throughout the Second Circuit, have granted far more substantial reductions in sentences than the one requested here; including cases where defendants had been serving life sentences. See, e.g. U.S. V. Castillo, No. H-08-146-01, 2020 WL 2832401, at *5 (S.D. Texas 5/29/2020) (reduction in sentence to time served "adequately reflect[ed] the Seriousness of the offense" despite life sentence for cocaine trafficking and money laundering conspiracy); Parker, 2020 WL 2572525, at *1 (granting Compassionate Release despite Life Sentence for violent drug trafficking conspiracy); U.S. V. Curtis, No. 03-533, 2020 WL 1935543, at *4 (D.D.C. 4/22/2020)(granting Compassionate release because "Consideration of the factors listed in [S]ection 3553(a) d[id] not counsel against" it, despite six life sentences for child sex trafficking). Moreover, the more than ten years (almost 11-years) in federal prison that Mansoor has already served, represents a substantial Sentence under any circumstances.

III. 28 U.S.C. §944(t) and U.S.S.G §1B1.13 - Compelling and Extraordinary Reasons→

28 U.S.C. §944(t) gives the sentencing commission the authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the

-15-

criteria to be applied and a list of specific examples. The Policy Statement issued in exercise of that authority, provides examples of "extraordinary and compelling reasons" in the application notes as follows:

"(i) terminal illness; (ii) physical or mental health condition; (iii) advanced age and deteriorating health - in combination with the amount of time served; (iv) compelling family circumstances; and (V) any other extraordinary and compelling reason ... as determined by the Director of the B.O.P.(-)"

See U.S.S.G. § 1B1.13.2 cmt. n.1 (A)-(D).

Although the catch-all provision is limited to reasons "as determined by the Director of the B.O.P.", id. cmt. n.1 (D), courts have found that this limitation "no longer describes an appropriate use of sentence modification provisions, and is thus not part of applicable Policy Statement binding the Court. U.S. V. Cantu, 423 F.Supp. 3d 345, 352 (S.D. Texas 6/17/2019); U.S. V. Kirschner, 1:10-cr-00203-JPH-MJD (Dist. Indiana 2020) (the court noted that the offense conduct was extremely serious and "the nature and circumstances of the crime were horrific" (for Child Pornography) (the court also noted that he would be under stringent terms of the court supervision for the rest of his life.); U.S. V. Urkevich, 2019

-16-

U.S. Dist. LEXIS 197408 (D. Neb. 11/14/19) (noting that the Sentencing Commission has not amended §1B1.13 since the First Step Act was signed into law on 12/18/2018, one would "infer that the Commission would apply the same criteria, including the catchall provision and that the Court may use Application Note 1(D) as a basis for finding extraordinary and compelling reasons to reduce a sentence.") This reading of the statute is based on the "text, the statutory history, the structure, and the consideration of Congress' ability to override' any of the Commission's policy statements at any time." id. As such, the BOP is no longer the "sole determiner" of what constitutes any "extraordinary and compelling reasons other than those delineated in U.S.S.G. §1B1.13 cmt. n.1 (A)-(c) warrant granting relief." id. U.S. v. Beck, 1:13-cr-186-6 (M.D. N.C. 6/28/19)[3]

Mansoor has listed four compelling/extraordinary reasons, including:

1 - COVID-19;
2 - §3553(a) Sentencing Factors;
3 - Post Sentencing Rehabilitation; and
now - 4 - Current Case Law

[3] See e.g., U.S. v. Dominguez, No. 1:93-cr-00401-DLG (S.D. Fla 2020); U.S. v. Juan Ledezma-Rodriguez, 2020 WL 3971517, 3:00-cr-00071 (S.D. Iowa 2020) (All three were life sentences!) (U.S. Sentencing Commission's Sentencing Guidelines are now incompatible with statute and thus a court need not follow an outdated portion of U.S.S.G. §1B1.13.) id.

-17-

## IV. CURRENT CASE LAW - HAD MANSSOR BEEN SENTENCED TODAY, HIS SENTENCE WOULD BE SUBSTANTIALLY LOWER, LESS THAN 25-YEARS -

A fundamental promise of our Constitution is that it is not what one "really" does that can be punished, but only that conduct which is proven at trial. The mandate of the U.S. Constitution is simple and direct: If the law identifies a fact that warrants deprivation of a defendant's liberty or an increase in that deprivation, such fact must be proven to a jury beyond a reasonable doubt. See U.S. Const. Art. III Section 2, cl. 3.

### A. Alleyne v. U.S., 133 S.Ct. 2151 (2013)

In Alleyne, the Court announced a new constitutional rule by redefining what a "crime" is in the context of the Sixth Amendment. Acknowledging that the historic "relationship between crime and punishment" compels that any fact which by law increase the range of punishment to which a criminal defendant is exposed "[IS AN ELEMENT OF A NEW OFFENSE, A DISTINCT AND AGGRAVATED CRIME]" These elements are entitled the full panoply of constitutional protections under the Sixth Amendment "in conjuction with due process."

In Manssor's case, had manssor been sentenced today, the Court would have been unable to run all three counts consecutive to one another (ten-years + ten-years + five years or

-18-

twenty-five years.) A jury would have had to found beyond a reasonable doubt to substantiate Manssor's current unconstitutional stacked (consecutive sentences) that violated Manssor's due process and 5th and 6th Amendments to the U.S. Constitution and right to trial.

B. The First Step Act of 2018-

Congress enacted The First Step Act to rectify wrongs. It would be untenable to assume that Congress, when acting to rectify wrongs, meant to direct courts to perpetuate unconstitutional practices. Under the First Step Act, we now have a well-considered statement of federal policy by Congress since Manssor was originally sentenced.

The First Step Act favors sending fewer people to prison; imposing shorter sentences for drug crimes, reduces the disparity between crack and powder cocaine offenses, reduces mandatory minimums; emphasizes safety-valves for first time offenders[+] with no criminal history in Category I to as high as Category III with limited prior history; and under 18 U.S.C. § 3582(c)(1)(A), allows courts a "broader discretion" in reviewing all facts and issues in a case when determining a reduction of a sentence.

[+] In Manssor's case, at the age of 54, Manssor had no prior Criminal History Record and was never warranted any type of safety-valve or reduction for first time offense.

-19-

## V. APPOINTMENT OF COUNSEL

Due to the significance of a new Prison Reform First Step Act Bill that became in the first ever Prison Reform Law, and in conjunction with the U.S.C. §30006A-(b), Petitioner respectfully requests for an Appointment of Counsel. 5

Executed and signed on this 12th of February, 2021.

Manssor Arbabsiar / Petitioner
In PRO PER/Affiant
Reg. No. 65867-054
Federal Correctional Complex
Yazoo City Medium
P.O. Box 5000
Yazoo City, MS 39194-5000

5 18 U.S.C. §3582(c)(i)(A).

- 21 -

and consistent positive traits and character with factory working abilities. These true circumstances lead Manssor to seek a sentence reduction under the federal compassionate release statute. See 18 U.S.C. §3582(c)(1)(A)(i). With the fact that Manssor is 66 years old, an exceptional post-sentencing rehabilitation (see U.S. v. Zavala-Cervantez, No. 2:06-cr-00016-RHW, 2015 WL 1366 5040, at #3 (E.D. Wash. 12/10/2015)(Holding that by imposing a reduced sentence based in part on the defendant's good behavior while incarcerated), and the fact that Manssor is willing to be deported back to IRAN and never to return to the United States all adds to the determination that he presents extraordinary and compelling reasons that support and warrant a sentence reduction. Manssor, therefore, respectfully requests that this Court use its broader discretion and GRANT a reduction of his sentence to time served for compassionate release all in the interest of justice and to prevent fundamental miscarriage of justice.

Dated: 2/12/2021

Manssor Arbabsiar/In Pro
Affiant/Petitioner

-20-

## VI. CLOSING

An extra year, day, or moment of freedom from prison, when warranted, is worth pursuing by Manssor, and, if justified by the law, should be granted by the Court.[6] Having justified extraordinary and compelling reasons, Manssor would also like the Court to consider that under the §3553(a) factors, Manssor wou[ld] be willing to sign any documentation that wou[ld] involve him being deported back to his Native Country Iran and never returning ba[ck] to the United States. His mother, Parvin Sha[] is in dire need of her son's care, and Manss[or] would return back to Iran to take care of h[is] mother and family, never to return back [to] the United States.

Manssor's extraordinary rehabilitation[al] shows his true intentions by his Factory ma[] at his UNICOR job where he has conduct[ed] a consistent trend of good work ethic[s]

---

6   U.S. v. Mauman, 2020 U.S. Dist. LEXIS 28392 (D.[] 2/18/2020); U.S. v. Moore, 3:16-CR-00171-JO, 2020[] 2572529 (D. ORE 5/21/2020); U.S. v. Jackson, No.4:[] 00576, 2020 WL 1953402 (S.D. Tex 4/23/2020); 4[] Braunan, No. 4:15-CR-80-01 (S.D Tex 4/2/2020);

*7   See Attachment 4 - Reference letter

## CERTIFICATE OF SERVICE

I, Manssor Arbabsiar, hereby certify that I have served a true and correct copy of the following:

Motion For Compassionate Release

This ACTION is deemed filed at the time it was delivered to prison authorities for forwarding, [see *Houston v. Lack*, 101 L.Ed.2d 245 (1988)], upon the defendant(s) or plaintiff(s), and/or their attorney(s) of record, by placing said MOTION/PETITION(s) in a sealed, postage pre-paid envelope addressed to:

U.S. District Court
District of Southern New York
Clerk of the Court
U.S. Courthouse

U.S. Attorney's Office
To-Be Served By The
Clerk of the Court
DUE TO COVID-19 CRISIS

Copy For Manssor Arbabsiar
@ FCC - Yazoo City Mediv

This LEGAL ACTION was deposited in the United States Mail at the FCC-Yazoo City Legal Mail Room, located in Yazoo City, Mississippi. I declare, under penalty of perjury, that the foregoing is true and correct, pursuant to 28 U.S.C.§ 1746.

EXECUTED and SIGNED on this 12th day of February, 2021.

Manssor Arbabsiar
Petitioner/IN/PRO PER /Affiant
Reg No. 65807-054
FCC-Yazoo City Medium
PO Box 5000
Yazoo City, MS 39194-5000

-22-

BP-A0757
JUN 10

U.S. DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF PRISONS

**INMATE REQUEST FOR CERTIFICATION OR JUDICIAL NOTICE OF PRESENTENCE REPORT AND/OR STATEMENT OF REASONS**

TO THE CLERK OF COURT: This form is filed as an ATTACHMENT to my pleading in the following current cause of appeal (indicate current case caption, docket no., judicial district, etc.):

My current cause of action or appeal is (check all that apply) :

☐ A direct appeal of my original criminal conviction of sentence (filed with the U.S. Court of Appeal);

☐ An original petition for writ of habeas corpus pursuant to title 28 USC §2255, or appeal of its denial, regarding my criminal conviction or sentence (filed with sentencing court or U. S. Court of Appeals); or

☑ Other, e.g., §2241 habeas petition; Privacy Act of 1974 (5 USC §552a), etc. (describe): *FIRST STEP ACT / THE CARES ACT 18 U.S.C. 3582(c)(1)(A)*

As part of my current cause of action or appeal, I request the court consider my Presentence Report (PSR) and Judgement (including State of Reasons (SOR)), where necessary, from my **Underlying criminal case,** described as follows (indicate underlying criminal case caption, docket no., judicial district, sentencing judge and date, etc.):

This form is for informational and notification purposes, and is not intended to create a new procedural requirement for inmates, courts, or clerks.

| Respectfully submitted: | Inmate Printed Name *MANSSOR ARBABSIAR* |
|---|---|
| Inmate Signature *[signature]* | Institution Address *P.O. BOX 5000 FCC-YAZOO CITY MEDIUM YAZOO CITY, MS 39194* |
| Reg. No. *65807-054* | Date Signed *February 12, 2021* |

DIRECTION TO INMATE: The bureau of prisons prohibits inmate from possessing copies of their Presentence Reports (PSR) or Statement of Reasons (SOR) from criminal judgements. This form is for you to ATTACH to any court action where, as part of your case of action or appeal, you request the court to consider your PSR or SOR. Complete this form as indicted, and submit it as an ATTACHMENT to your pleading to the court considering your current cause of action or appeal. This form is not a pleading, but an ATTACHMENT requesting the court obtain and consider your PSR and/or SOR when needed. You only need this form when your cause of action involves the PSR or SOR. Be sure to indicate in your pleading the specific part(s) of the PSR or SOR your believe relevant to our case.

-23-

Prescribed By P1351

PDF

# Exhibit 1

EXHAUSTION OF
ADMINISTRATIVE
REMEDY TO WARDE

( ATTEMPTS WITH N
RESPONSE )

*Compassionate Release Request*    18 U.S.C. § 3582(c)(1)

BP-S148.055  **INMATE REQUEST TO STAFF** CDFRM

*First Step Act / The Cares Act*

SEP 98

U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) | DATE: November 27, 2020 |
| Warden Petten | |
| FROM: | REGISTER NO.: 62807-054 |
| Mansoor Arbabsiar | |
| WORK ASSIGNMENT: | UNIT: D-2   #13(L) |
| Unicor | |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

In light of another recent outbreak, I am writing
to request a Compassionate Release and/or release
to Home Confinement - As an immunocompromised
risk to this Covid-19 crisis, my age, my weight
(BMI +30), the fact that we have remained on a
lock-down / quarantined status since March 30, 2020
and this facility's inability to follow CDC guide-
lines and shortage of staff, I would be a key
candidate as outlined by congress under the Cares Act
First Account and US. Attorney General Barrs delegated
authority to Wardens to grant Compassionate Release/cost
If no response or denial I have EXHAUSTED my remedy to then
proceed to my sentencing Jud

(Disposition - please advise)

---------------(Do not write below this line)---------------

DISPOSITION:

MY EXHAUSTED
REMEDY WITH
NO RESPONSE
From Warden

EX. 7

Signature Staff

Record Copy - File; Copy - In.    This form replaces BP-148.070 dated Oct 86
(This form may be replicated v    and BP-S148.070 APR 94

PRINTED ON RECYCLED PAPER

# Attachment 2

Michael Jones
Misdiagnosed

X-RAY
(CHEST)

Exam Requisition



## FCI-I Yazoo City YAM

| | | DOB: | 12/16/80 |
|---|---|---|---|
| Patient: | JONES, MICHAEL (Male) | Age: | 37 |
| Register#: | 10720-010 | Status: | OP |
| Date: | 09/26/18 09:31 | | |

Slicecount:        2
History:        shortness of breath
Priors:        cxr 9/12/16
Exams:        FILM CXR 2 VIEWS
Referring Phy:
Ordering Phy:
Ordering Phy #:
Accession Numbers: 202#BOP00005985

### Final Report

Exam: FILM CXR 2 VIEWS

HISTORY: Shortness of breath        *(Left out the history of T.B.)*

TECHNIQUE: Frontal and Lateral views obtained

COMPARISON: September 12, 2016

FINDINGS: The cardiac silhouette is normal. Trachea is midline. There is new patchy airspace consolidation in the right upper lung field. There is a loculated chronic left pleural effusion. There is left perihilar hazy alveolar opacity. This is grossly stable. There is no pneumothorax. Thoracic musculoskeletal structures are stable.

IMPRESSION:
New patchy airspace consolidation in the right upper lung field suspicious for pneumonia. Correlate with clinical presentation.

Stable loculated chronic left pleural effusion. There is also left perihilar hazy alveolar opacities.

Radiologist:        Maurice Yu, MD

Study ready at 09:31 and initial results transmitted at 11:12

*ATTACH 2*

# Attachment 3

POST - SENTENCING
REHABILITATION
(PROGRAMMING)



## Individualized Needs Plan - Program Review   (Inmate Copy)

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: ARBABSIAR, MANSSOR   65807-054

SEQUENCE: 01716245
Team Date: 07-30-2020

| | | |
|---|---|---|
| Facility: | YAM  YAZOO CITY MED FCI | Proj. Rel. Date:   02-06-2033 |
| Name: | ARBABSIAR, MANSSOR | Proj. Rel. Mthd:   GCT REL |
| Register No.: | **65807-054** | DNA Status:   NYM01656 / 10-11-2011 |
| Age: | 65 | |
| Date of Birth: | 03-15-1955 | |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| YAM | UNICOR 4 | ACU INITIAL | 01-13-2020 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| YAM | ESL HAS | ENGLISH PROFICIENT | 07-16-2013 |
| YAM | GED HAS | COMPLETED GED OR HS DIPLOMA | 07-18-2013 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| YAM | C | PIANO | 09-04-2019 | 10-16-2019 |
| YAM | C | PIANO | 07-05-2019 | 09-04-2019 |
| YAM | C | OIL PAINTING | 03-23-2019 | 05-27-2019 |
| YAM | W | MS OFFICE APP; M-F, 8:00-10:30 | 04-22-2019 | 05-17-2019 |
| YAM | C | YOGA I | 03-25-2019 | 05-13-2019 |
| YAM | C | INFECTIOUS DISEASE | 02-20-2019 | 02-20-2019 |
| YAM | C | INFECTIOUS DISEASE | 02-20-2019 | 02-20-2019 |
| MAR GP | C | CMU DRAWING CLASS | 01-08-2018 | 03-26-2018 |
| MAR GP | C | GREETING CARD CLASS | 04-29-2018 | 06-19-2018 |
| MAR CMU | C | CMU ADV BEADING | 08-21-2017 | 09-25-2017 |
| MAR CMU | C | CARD MAKING CLASS | 08-21-2017 | 09-25-2017 |
| MAR CMU | C | CMU LEGAL RESEARCH ACE | 01-09-2017 | 04-03-2017 |
| MAR CMU | C | ACE CLASS SPANISH 2 | 09-21-2016 | 11-28-2016 |
| MAR CMU | C | ACE CLASS - PUBLIC SPEAKING | 10-05-2016 | 12-19-2016 |
| MAR CMU | C | ACE CLASS - BEGINNING SPANISH | 06-20-2016 | 09-07-2016 |
| MAR CMU | C | CMU OIL PAINTING | 07-18-2016 | 09-20-2016 |
| MAR CMU | C | CMU CROCHET CLASS | 07-18-2016 | 09-20-2016 |
| MAR CMU | C | CMU PAINTING CLASS | 01-12-2016 | 03-29-2016 |
| MAR CMU | C | I UNIT BEADING CLASS | 10-13-2015 | 12-18-2015 |
| MAR CMU | C | CMU PAINTING CLASS | 10-14-2015 | 12-18-2015 |
| MAR CMU | C | HOW TO BUY & SELL A CAR ACE | 10-19-2015 | 12-14-2015 |
| MAR CMU | C | BEYOND BARS #6 | 10-20-2015 | 11-04-2015 |
| MAR CMU | C | BEGINNER STICK ART | 04-14-2015 | 06-25-2015 |
| MAR CMU | C | CMU PAINTING CLASS | 04-14-2015 | 06-25-2015 |
| MAR CMU | C | CMU ANATOMY CLASS | 04-14-2015 | 06-25-2015 |
| MAR CMU | C | BEGINNER STICK ART | 10-13-2014 | 12-24-2014 |
| MAR CMU | C | WATERCOLOR PAINT CLASS | 04-18-2014 | 07-07-2014 |
| MAR CMU | C | CMU ANATOMY CLASS | 04-17-2014 | 07-07-2014 |
| MAR CMU | W | BEGINNER ORIGAMI | 04-15-2014 | 07-07-2014 |
| MAR CMU | C | CMU FITNESS CLASS | 04-14-2014 | 07-07-2014 |
| MAR CMU | C | CMU PAINTING CLASS | 04-16-2014 | 07-07-2014 |
| MAR CMU | C | CARD MAKING CLASS | 04-13-2014 | 07-07-2014 |
| MAR CMU | W | WATERCOLOR PAINT CLASS | 04-09-2014 | 06-25-2014 |
| MAR CMU | W | CMU ANATOMY CLASS | 04-14-2014 | 06-25-2014 |
| MAR CMU | W | CMU PAINTING CLASS | 04-12-2014 | 06-25-2014 |
| MAR CMU | W | BEGINNER ORIGAMI | 04-10-2014 | 06-25-2014 |
| MAR CMU | W | CMU FITNESS CLASS | 04-18-2014 | 06-25-2014 |

ATTACH 3

## Individualized Needs Plan - Program Review    (Inmate Copy)

SEQUENCE: 01716245
Team Date: 07-30-2020

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: ARBABSIAR, MANSSOR  65807-054

| SubFacl | Action | Description | Start | Stop |
|---------|--------|-------------|-------|------|
| MAR CMU | W | CARD MAKING CLASS | 04-08-2014 | 06-25-2014 |
| MAR CMU | C | CMU FITNESS CLASS | 01-22-2014 | 03-26-2014 |
| MAR CMU | C | CMU YOGA CLASS | 01-22-2014 | 03-26-2014 |
| MAR CMU | C | CMU CROCHET CLASS | 01-22-2014 | 03-26-2014 |
| MAR CMU | C | CMU DRAWING CLASS | 01-22-2014 | 03-26-2014 |
| MAR CMU | C | CMU PAINTING CLASS | 01-22-2014 | 03-26-2014 |
| MAR CMU | C | NUTRITION | 10-16-2013 | 12-23-2013 |

## Discipline History (Last 6 months)

| Hearing Date | Prohibited Acts |
|--------------|-----------------|

** NO INCIDENT REPORTS FOUND IN LAST 6 MONTHS **

## Current Care Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| CARE1 | HEALTHY OR SIMPLE CHRONIC CARE | 06-19-2013 |
| CARE1-MH | CARE1-MENTAL HEALTH | 07-18-2013 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| C19-RCVRD | COVID-19 RECOVERED | 04-22-2020 |
| NO PAPER | NO PAPER MEDICAL RECORD | 04-17-2014 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 10-31-2013 |
| YES F/S | CLEARED FOR FOOD SERVICE | 12-11-2018 |

## Current Drug Assignments

| Assignment | Description | Start |
|------------|-------------|-------|
| ED COMP | DRUG EDUCATION COMPLETE | 06-04-2014 |

## FRP Details

Most Recent Payment Plan

| FRP Assignment: | COMPLT | FINANC RESP-COMPLETED | Start: 03-27-2017 |
|---|---|---|---|
| Inmate Decision: | AGREED | $25.00 | Frequency: QUARTERLY |
| Payments past 6 months: | $0.00 | | Obligation Balance: $0.00 |

Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|-----|------|--------|---------|---------|--------|
| 1 | ASSMT | $300.00 | $0.00 | IMMEDIATE | COMPLETEDZ |

** NO ADJUSTMENTS MADE IN LAST 6 MONTHS **

**Payment Details**

Trust Fund Deposits - Past 6 months:  $2,157.31          Payments commensurate ?   Y

New Payment Plan:        ** No data **

## Progress since last review

Assumed for Echo 3 caseload.

Due to the current national/local lockdown and modified operations related to the COVID-19 Pandemic activation on March 20th, there is limited programming available.  Further, his housing unit was locked down for quarantine related to active exposures/COVID-19 cases. The goals established at his last team to be completed by this team have been extended to his next team due to the unknown date of normal operations resuming.

## Next Program Review Goals

Due to the current modified operations and limited programming related to the COVID-19 Pandemic, the goals established during his last team prior to March 2020 have been extended to be completed by his next team date of 01-25-2021.

## Long Term Goals

The Unit Team recommends he save at least $150 for release/in-transit purposes by 01-25-2021.

## RRC/HC Placement



**Individualized Needs Plan - Program Review    (Inmate Copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: ARBABSIAR, MANSSOR   65807-054

SEQUENCE: 01716245
Team Date: 07-30-2020

**Comments**

Continue to Maintain clear conduct.
Continue to receive good work reports.

PPG7                                                                    Page 1 of 1

     YAM61   606.00  *      MALE CUSTODY CLASSIFICATION FORM      *      02-25-2021
PAGE 001 OF 001                                                              12:25:15

(A)  IDENTIFYING DATA

REG NO..: 65807-054              FORM DATE: 04-15-2020              ORG: DSC
NAME....: ARBABSIAR, MANSSOR

                                 MGTV: GRTR SECU
PUB SFTY: GRT SVRTY,SENT LGTH    MVED: 04-14-2022

(B)  BASE SCORING

DETAINER: (0) NONE              SEVERITY.......: (7) GREATEST
MOS REL.: 153                   CRIM HIST SCORE: (00) 0 POINTS
ESCAPES.: (0) NONE              VIOLENCE.......: (0) NONE
VOL SURR: (0) N/A               AGE CATEGORY...: (0) 55 AND OVER
EDUC LEV: (0) VERFD HS DEGREE/GED   DRUG/ALC ABUSE.: (0) NEVER/>5 YEARS

(C)  CUSTODY SCORING

TIME SERVED.....: (4) 26-75%    PROG PARTICIPAT: (2) GOOD
LIVING SKILLS...: (2) GOOD      TYPE DISCIP RPT: (5) NONE
FREQ DISCIP RPT.: (3) NONE      FAMILY/COMMUN..: (4) GOOD


--- LEVEL AND CUSTODY SUMMARY ---

BASE CUST VARIANCE  SEC TOTAL  SCORED LEV MGMT SEC LEVEL  CUSTODY  CONSIDER
+7   +20     -4        +3       LOW          MEDIUM          IN     DECREASE


G0005       TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED

https://bop.tcp.doj.gov:9049/SENTRY/J1PP160.do                          2/25/2021

## THE FIRST STEP ACT

On December 21st, 2018, President Trump signed into law the First Step Act. Congress and the Trump Administration were well aware of the deep unfairness that exists within our broken criminal justice system and the transformative impact legislation can have on people's lives. Congress and the Trump Administration enacted a prison reform bill to rectify wrongs. It would be untenable to assume that Congress and the Trump Administration, when acting to rectify wrongs, meant to direct courts to perpetuate unconstitutional practices.

Since my incarceration, conviction and sentence, numerous events, case law rulings, amendments, etc., have transpired that I have not been able to participate in that would have dramatically had an impact on my case and would have resulted in a substantial reduction of my sentence. Most of these new rulings and cases were not retroactive and prevented me from any vehicle or avenue to get back into court. Now, with the First Step Act, the President has now given us the chance and opportunity with a vehicle and a way to get back into Court and before my sentencing judge for a review under 18 U.S.C. § 3582(c)(1)(A) based on compelling and extraordinary reasons that would warrant some type of reduction and/or modification to my sentence. In Dillon v. U.S., 560 U.S. 817, 819 (2010), a "federal court generally may not modify a term of imprisonment once it has been imposed." However, through the First Step Act, Congress and the Trump Administration have now expressly authorized the Court to conduct a plenary resentencing in light of current law.

## POST-SENTENCING REHABILITATION

U.S. v. Peppers ruling in the Supreme Court allowed the Courts to use § 3553(a) resentencing factors to review an inmate's post-sentencing rehabilitation. Prior to my conviction and sentencing, I was labeled as a "threat to the community and to society." Now after many years of being incarcerated and my consistent involvement in programming, schooling, employment, religious services, and recreational activities for my health and well-being, there is enough evidence to clearly establish that I am no longer a threat assessment to my community or to society. Not only have I been an examplar to both Staff and other fellow inmates, but I have been able to take full advantage of all programs to better myself, change my lifestyle and prior drug related criminal behaviors, learn new skills and hobbies, become a better father and supporter to my family and loved ones, and gain a closer relationship with my Lord and Savior and Father in Heaven. Constant scripture study and fervent prayer has enlightened me and given me hope to succeed, be truly forgiven, and to be a product and positive member in society and in my local neighborhood. I would no longer be considered a "threat to society or my community," (nor would I be one of those that fall into the pitfalls of recidivism. I have family, friends and associates that support me and will be my support system to help me succeed. I have a home to be released to. I have several offers for immediate employment and for immediate income establish an early solid foundation. I have outlined for my goals and priorities a solid six-month plan and two-year plan for myself to use as a map and guideline to help me stay focused and in-line for future success and prosperity.

# Attachment 4

UNICOR



# United States Government
# Memorandum

Federal Prison Industries
Post Office Box 5000
Yazoo City, MS 39194

TO:         To Whom It May Concern

FROM:       B. Gunn / Factory Manager

DATE:       March 18, 2021

SUBJECT:    **Letter of Recommendation from B. Gunn For Arbabsiar, Manssor #65807-054**

UNICOR inmates learn real-world job skills and gain work experience in such areas as clothing and textile, electronics, and vehicle reconditioning that will help them find jobs after they are release. At UNICOR, we pride ourselves in providing the rehabilitative opportunity to instill values of hard-work, honesty, integrity, group participation, goal setting, problem solving and much more qualities which benefit inmates as they transition back into society. As the current Factory Manager in FCC Yazoo City Medium in Mississippi where inmate Arbabsiar, Manssor # 65807-054 currently is employed as an ACU Operator in the ACU - OCP Trouser Department, I state the forgoing.

Our records reveal inmate Arbabsiar, Manssor has been employed by UNICOR since November 2018 thru current date. His employment trajectory is reflective of the motivation to rehabilitate and improve to incorporate back into society. During this time period inmate Arbabsiar has been observed demonstrating the following: respectful communications with UNICOR staff members, arrives on time for work, shows initiative to effectively complete his daily operations as ACU - Operator in the ACU OCP Trouser Department, which directly affects the factory output flow for production, and he communicates well in training inmates. We have had no incidents with him and appreciate his skills as an ACU Operator in the ACU - OCP Trouser Department

It is my observation of inmate Arbabsiar's character, while in UNICOR, which is memorialized in this reference letter for the benefit of presenting Unit Team with documentation and any Post-Sentencing Rehabilitation efforts towards any Compassionate Release. Research demonstrates that inmates who work in prison industries were _24 percent_ less likely to recidivate that non-program participants, and _14 percent_ more likely to be gainfully employed.



**U. S. Department of Justice**
**Federal Prison Industries**
**UNICOR (YZII)**
Federal Correctional Complex
P. O. Box 5666
Yazoo City, Mississippi 39194

# MEMORANDUM

Date:       August 31, 2020

FROM:     R. Hampton, UNICOR Quality Assurance Manager
          B. Gunn, Factory Manager

TO:         Unit Team

SUBJECT:  Work Programs for Inmates FPI

In conjunction with the Purpose and scope of FBOP Program Statement 8120.03; Federal Prison Industries, Inc. was established as a program to provide meaningful work for inmates. This work is designed to allow inmates the opportunity to acquire the knowledge, skills, and work which will be useful when released from the institution.

The ISO 9001:2015 is a 60 hour FPI certified Quality training program developed to ensure its graduates meet the requirements, and can effectively implement and maintain the Quality Management system. All internal quality auditors will complete the training criteria stated on the internal quality training record. Auditors will be tested using the Internal Quality Auditing Exam f-9200-7; A PASS/FAIL Rating of 90% on the exam in required for completion of the internal quality auditing training course. A record of each internal auditor will be documented on Internal Audit Training Record f-9200-9. All records are to be maintained in accordance with P-7530, Control of Documented Information.

It is FPI policy to established approved apprenticeship programs in the areas of industrial operations that have the potential to meet the requirements of the:

- Bureau of Apprenticeship Training (BAT) of the U.S. Department of Labor.
- Department of Education of the state in which the training is located.
- Training Representative of the appropriate labor union.

Refer to the Program Statement **Occupational Education Programs** for further information.

B. Gunn, Factory Manager

# FEDERAL PRISON INDUSTRIES UNICOR

*"UNICOR WANTS TO BE YOUR FIRST CHOICE!"*



In 1934, UNICOR FEDERAL PRISON INDUSTRIES, INC. was incorporated to train and productively employ inmates. Through the years, UNICOR has made well-documented contributions toward reducing recidivism, improving prison safety, and lowering incarceration costs in the federal prison systems. Today, UNICOR workers have the opportunity to learn marketable skills along with the rewards of a job well done. This aspect of social responsibility is a good reason to choose UNICOR, but there are plenty of compelling reasons as well!

## Inmate Employment Opportunities

At full capacity, FCI Yazoo City UNICOR employs on average 300 inmates ranging among a broad arrangement of professions such as:

1. Sewing Operators
2. Material Cutters
   a. Job Requirements:
      i. Ability to read measuring equipment (rulers, etc.)
      ii. General knowledge of Math and Fractions
3. Mechanics
   a. Job Requirements
      i. Ability to read measuring equipment (rulers, etc.)
      ii. General knowledge of Math and fractions
      iii. Mechanical ability
4. Quality Inspectors
   a. Job Requirements:
      i. Ability to read measuring equipment (rulers, etc.)
      ii. General knowledge of Math and fractions.
5. Business Office Clerical Positions (When Available)
   a. Job Requirements:
      i. Computer experience is desired.
      ii. General knowledge of Math and fractions.

Consistent with Reentry support efforts, UNICOR is hiring inmates with three years or less from release in order to create opportunities to build skills and transition into the expectations of a work environment for those inmates close to release.

## If You Are Interested In UNICOR Employment?!?!

1. Retrieve an application from your Counselor
2. Submit filled application to your Counselor

After receiving your application, you will be placed on a waiting list and called for an interview soon after.

## Our Product and Customers

The UNICOR Textile factory is responsible for the production of the following products for our troops in the Active and Reserve Military Units, and a number of Governmental Agencies that are under the direction of Homeland Security: Outer Tactical Vests (OTV), Civilian and Stab Vests, Carrier Bags, and Backpacks. *Here's a look at the upcoming work for this year!*

7, 294 OTV Vests
1092 Backpacks
295 Civilian Vests

**New Products Coming Soon!**
*Gas Mask Bags*
*Improved Outer Tactical Vests (IOTV)*

# Attachment 5



# LONG-TERM SENTENCES: TIME TO RECONSIDER THE SCALE OF PUNISHMENT

### Marc Mauer[*]

In recent years, there has been a growing bipartisan consensus that the uniquely American policy of mass incarceration is both fiscally and morally unsustainable. Several decades of policy initiatives prioritizing the use of the criminal justice system as the primary means of addressing crime have vaulted the United States into the unenviable position of being a world leader in the use of imprisonment.[1] This phenomenon has produced a host of undesirable ripple effects—the collateral consequences of a felony conviction—that now greatly impair the life prospects of millions of individuals, with a particularly striking effect on low-income communities of color.

This article will describe the origins and contours of the growing movement for justice and sentencing reform and assess its impact on the scale of incarceration to date. There are good reasons to be encouraged about these developments. However, it is also clear that at the current pace of decarceration, the cumulative effect of this movement will fall far short of what is necessary to achieve a more rational, compassionate balance in the justice system.

A key issue in assessing the decarceration trend is American sentencing policy and practice related to the length of prison terms. Defendants convicted of felonies in the U.S. are more likely both to be sentenced to prison and to serve more time in prison than in comparable nations.[2] The excessive nature of punishment in the U.S. is not based on a rational analysis of incarceration and the fundamental objectives of sentencing policy. Moreover, unduly long prison terms are counterproductive for public safety and contribute to the dynamic of diminishing returns as the prison system has expanded.

## I. THE RISE OF MASS INCARCERATION

Incarceration in the United States rose at an unprecedented rate for nearly four decades beginning in 1973.[3] Research by the National Research Council reveals that, between 1980 and 2010, the 222% increase in the rate of incarceration in state prisons was a function of changes in policy, not changes in crime rates.[4]

---

* Marc Mauer is the Executive Director of The Sentencing Project in Washington, D.C. He is the author of *Race to Incarcerate*, co-editor (with Meda Chesney-Lind) of *Invisible Punishment: The Collateral Consequences of Mass Imprisonment*, and co-author (with Ashley Nellis) of *The Meaning of Life: The Case for Abolishing Life Sentences*, all from The New Press. Thanks to Nazgol Ghandnoosh and Ashley Nellis for constructive feedback and discussion of these issues.

1 *See* Michelle Ye Hee Lee, *Yes, U.S. Locks People Up at a Higher Rate Than Any Other Country*, WASH. POST (July 7, 2015), http://www.washingtonpost.com/news/fact-checker/wp/2015/07/07/yes-u-s-locks-people-up-at-a-higher-rate-than-any-other-country/?utm_term=.9375e417616d.

2 *See* AMANDA PETTERUTI, JUST. POL'Y INST., FINDING DIRECTION: EXPANDING CRIMINAL JUSTICE OPTIONS BY CONSIDERING POLICIES OF OTHER NATIONS 10-13 (2011), http://perma.cc/7RAS-5MXG.

3 *See* NAT'L RES. COUNCIL, THE GROWTH OF INCARCERATION IN THE UNITED STATES: EXPLORING CAUSES AND CONSEQUENCES 33 (J. Travis et al. eds., 2014).

4 *Id.* at 52-55.





## A. "Aging Out" of Crime

A longstanding finding in the criminology literature is that involvement in criminal activity is strongly dependent on age, an outcome that cuts across race and class lines. Increased involvement in crime begins in the mid-teen years and rises sharply, but for a relatively short period of time.[46] For most crimes, these rates of involvement begin declining by a person's early to mid-twenties and continue on a downward trajectory. Looking at rates of robbery, for example, these peak at age nineteen and, by their late twenties, have declined by more than half.[47]

These dynamics have significant meaning for the length and effectiveness of prison terms. In the federal prison system, the median age range in prison is 36 to 40 years old,[48] well past the peak age of criminal involvement. Further, the length of stay for released federal prisoners doubled between 1988 and 2012, from an average of 17.9 months to 37.5 months.[49] This rise is largely attributed to policy changes, including the implementation of the sentencing Guidelines, elimination of parole, and advent of a new generation of mandatory sentencing laws.

To be clear, just because the risk an individual may pose to public safety declines with age does not mean that incarceration is an inappropriate sentencing option. Long periods of incarceration can satisfy other sentencing goals, such as recognizing the seriousness of an offense. But to the extent that incarceration is imposed primarily for incapacitation, judges and policymakers should be cognizant that each successive year of incarceration is likely to produce diminishing returns for public safety.

Another key element of the declining effectiveness of incapacitation is that the aging process leads to higher costs of incarceration, primarily due to increased health care needs.[50] In this regard, prisoners are no different than the general population; they require more health resources as they age. But a key distinction is that a person's health generally declines more rapidly in prison.[51] This is partly a function of the relatively inadequate access to health care services of many individuals before they came to prison, and partly related to the stressful environment of a correctional institution. As a consequence, the annual cost of

---

[46] *See* Nellis, *supra* note 30.

[47] HOWARD N. SNYDER, BUREAU JUST. STATISTICS, U.S. DEP'T OF JUST., NCJ 239423, ARREST IN THE UNITED STATES: 1990-2010, at 5 fig. 9 (2017), http://www.bjs.gov/content/pub/pdf/aus9010.pdf.

[48] *See Statistics on Inmate Age*, FED. BUREAU PRISONS, http://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last visited July 18, 2018). Note that these figures only apply to released prisoners and not to those sentenced to life without parole.

[49] *See Prison Time Surges for Federal Inmates*, PEW CHARITABLE TRUSTS (Nov. 18, 2015), http://www.pewtrusts.org/en/research-and-analysis/issue-briefs/2015/11/prison-time-surges-for-federal-inmates.

[50] *See* Matt McKillop & Alex Boucher, *Aging Prison Populations Drive Up Costs*, PEW CHARITABLE TRUSTS (Feb. 20, 2018), http://www.pewtrusts.org/en/research-and-analysis/analysis/2018/02/20/aging-prison-populations-drive-up-costs.

[51] *Id.*



incarceration—generally estimated at about $30,000 per prisoner—can easily double for elderly prisoners.

## B. Limited Deterrent Effects

On the day of sentencing, judges frequently tell a convicted defendant that they are being sentenced to prison to "send a message" that their criminal behavior will not be tolerated. The human instinct to do so is understandable, but unfortunately, the value of this message is often insignificant.

The deterrent effect of the criminal justice system has been studied for hundreds of years, with increasing sophistication in recent decades. In regard to the impact of punishment on potential offenders, a key finding is that deterrence is primarily a function of the *certainty* of punishment, not its *severity*.[52] Daniel Nagin, a leading deterrence scholar in the United States, concluded that "[t]he evidence in support of the deterrent effect of the certainty of punishment is far more consistent and convincing than for the severity of punishment" and that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension."[53]

This finding makes intuitive sense. Consider a person who is thinking about stealing a car or burglarizing a local business. If he is thinking rationally, he will take into account a variety of factors when considering how to commit the crime, including time of day, ease of entry, presence of security personnel or technology, or his ability to leave the crime scene. He does this to avoid being caught in the act because being arrested and prosecuted will impose significant burdens on him. Additionally, because he is not planning on being apprehended, he is unlikely to be thinking about how much time he might spend in prison and whether his sentence will be three, five, or seven years.

Notably, this example looks at the behavior of a rational person, which rarely fits the picture of a substantial portion of those who actually commit a crime. Many are teenagers seeking peer approval for their illegal behavior, individuals under the influence of alcohol or drugs at the time of the offense,[54] or are motivated by economic challenges. Many of these individuals are not even thinking about the risk of being caught, let alone know how much prison time they may face.

The limited impact of extending sentence length becomes even more attenuated for long-term incarceration. If the penalty for a second robbery conviction is twenty years and a legislative body increases that penalty to twenty-five, few would-be robbers undeterred by the prospect of "only" a twenty year sentence would balk at an additional five years.

---

[52] *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 CRIME & JUST. 199, 207 (2013).

[53] *Id.*

[54] *See* JENNIFER BRONSON ET AL., BUREAU OF JUST. STATISTICS, U.S. DEP'T OF JUST., NCJ 250546, DRUG USE, DEPENDENCE, AND ABUSE AMONG STATE PRISONERS AND JAIL INMATES 2007-2009, at 6 tbl. 6 (2017) (between 2007 and 2009, nearly 42% of state prisoners were under the influence of some type of drug at the time of offense).



reduces rates of abuse and neglect and yields reduced arrest rates as the children grow up.[58]

## VII.  TIME SERVED IN PRISON CAN BE REDUCED WITHOUT HARMING PUBLIC SAFETY

There are two primary reasons that explain why time served in prison has increased so exponentially in recent decades.  The first relates to the political environment which led to the "tough on crime" policies of the 1980s and 1990s.  With only a handful of notable exceptions, politicians across the board and at every level of government embraced the movement to impose ever harsher penalties on people convicted of crime.  Bidding wars erupted in proposing ever more punitive measures for both serious and lower-level offenses.  Federal financial incentives to encourage states to adopt "truth in sentencing" policies, whereby parole consideration would not be possible until a prisoner incarcerated for a violent offense had served eighty-five percent of his sentence, contributed to more than half the states endorsing such legislation in the 1990s.[59]  Legislators in Mississippi went one step further, passing a truth in sentencing statute that required eighty-five percent time served for *all* offenses.[60]  Within just a few years, Mississippi's prison population and associated costs had ballooned so much that policymakers were forced to scale back the initiative substantially.

The second key factor in understanding the expansion of long sentences is that they make intuitive sense to most people as a crime control mechanism.  If for no other reason, keeping known offenders behind bars for a period of time ensures they will not harm anyone on the outside during their sentence.  As we have seen, this "intuitive" understanding substantially overestimates the actual impact on crime in the era of mass incarceration.

Believing that incarceration inherently improves public safety naturally correlates with a belief that reducing time served in prison would have negative consequences since the affected individuals would no longer be incapacitated.  Here, too, the common-sense observation turns out to be incorrect but remains as a significant obstacle to decarceration.

A number of real world case studies, at both state and federal levels, demonstrate that prison populations can be reduced substantially without adverse effects on public safety.  Trends in California have been the subject of a good deal of analysis following several initiatives designed to substantially reduce the prison population.  One of these, Proposition 47, reclassified a half-dozen property and

---

[58] *See* Peter W. Greenwood & Susan Turner, *Probation and other Non-Institutional Treatment: The Evidence Is In*, *in* THE OXFORD HANDBOOK OF JUVENILE CRIME AND JUVENILE JUSTICE 723, 726-28 (Barry Feld & Donna Bishop, eds., 2012).

[59] *See generally* PAULA M. DITTON & DORIS J. WILSON, BUREAU JUSTICE STAT., U.S. DEP'T OF JUST., NCJ 170032, TRUTH IN SENTENCING IN STATE PRISONS, at 1 (1999), http://bjs.gov/content/pub/pdf/tssp.pdf.

[60] *Id.* at 3.

AD-10

126                          *UMKC LAW REVIEW*                          [Vol. 87:1

drug offenses as misdemeanors rather than felonies and required that convictions result in local supervision rather than state incarceration.[61] The initiative was also applied retroactively, and as of 2017 nearly 4,700 people have been released from prison.[62] A comprehensive analysis by researchers at the University of California-Irvine found the shift had no impact on overall crime rates or violent crime.[63]

Policy decisions of the U.S. Sentencing Commission over the past decade have also demonstrated that federal sentences can be reduced without adversely affecting crime control goals. The first instance occurred from the Commission's Guidelines amendment change for crack cocaine convictions in 2007, which was made retroactive as of 2008. More than 16,000 individuals had their sentences reduced by about two years (from 107 months to 85 months).[64] A follow-up study compared recidivism rates for similar offenders released before and after the amendment took effect and found no statistically significant difference between the two groups.[65] A second study explored recidivism rates for prisoners affected by the retroactive application of the Fair Sentencing Act, lowering time served in prison by twenty percent (thirty months), and found virtually identical recidivism rates for this group and a comparison group who had served their full sentence prior to the adoption of the Act.[66]

As previously noted, the most substantial sentencing reduction initiative of the Commission was its "drugs minus two" decision in 2014 that reduced sentencing guideline levels for all drug offenses by two levels and was subsequently made retroactive in 2015.[67] This initiative decreased the average time served for those granted a reduction from twelve years to ten years.

The Commission established a review process for these cases, requiring judicial approval for any sentence reduction. In most federal jurisdictions, the U.S. Attorney's office and the Federal Public Defender reviewed cases and made a joint recommendation for sentence reduction in a substantial number of cases. For those cases where there was a disagreement, a hearing was held in court and a judicial determination was made. Overall, about two-thirds of the eligible population, or 31,000 individuals, were approved for a sentence reduction, to be applied over many years as these cases neared their end term.[68]

---

[61] *See* Jasmine Ulloa, *Prop. 47 Got Thousands Out of Prison. Now, $103 Million in Savings Will Go Towards Keeping Them Out*, L.A. TIMES, Mar. 29, 2017, http://www.latimes.com/politics/la-pol-sac-prop-47-grant-awards-20170329-htmlstory.html.

[62] *Id.*

[63] *Proposition 47 Not Responsible for Recent Upticks in Crime Across California, UCI Study Says*, U. CAL.-IRVINE NEWS (Mar. 7, 2018), http://perma.cc/6F7L-Q2YX.

[64] *New Law on Crack Cocaine Penalties Should Be Made Retroactive*, WASH. POST (Feb. 18, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/02/18/AR2011021806422.html.

[65] U. S. SENTENCING COMM'N, RECIDIVISM AMONG OFFENDERS RECEIVING RETROACTIVE SENTENCE REDUCTIONS: THE 2007 CRACK COCAINE AMENDMENT 15 (2014).

[66] U.S. SENTENCING COMM'N, RECIDIVISM AMONG OFFENDERS RECEIVING RETROACTIVE SENTENCE REDUCTIONS: THE 2011 FAIR SENTENCING ACT GUIDELINE AMENDMENT 18-19 (2018).

[67] 2014 DRUG GUIDELINES AMENDMENT RETROACTIVITY DATA REPORT, *supra* note 17.

[68] Jason Vitullo & Harry Sandick, *Circuit Clarifies Guidelines Provision Allowing Post-Conviction Reduction of Drug Sentences*, PATTERSON BELKNAP SECOND CIRCUIT LAW BLOG (Feb. 23, 2018), http://perma.cc/E4SN-23WH.

AO-11

A telling moment in this process illustrates the public environment in which criminal justice policymaking takes place. The retroactive drug guideline reduction went into effect on November 1, 2015, and because of the delay in implementation, there was a backlog of cases that became eligible for release on that day. Newspaper headlines across the country noted that 6,000 individuals would be released during that first week.

Because I am the executive director of a national organization engaged in public policy discussions on sentencing, I received a slew of interview requests from media outlets that week, generally seeking to discuss what preparations were being made to aid these people in their transition to the community. The question is an appropriate one, though painfully naïve in the context of mass incarceration. Of course we should be addressing the needs of these 6,000 people coming home from prison. But many overlooked the fact that these 6,000 releases represented less than one percent of the more than 600,000 people returning home from prison that year— and the previous year, and the year before that. Even with growing attention on reentry, the scale of resources devoted to such services is quite modest given the challenges in this area.

The Commission's policy shift should certainly be commended as a significant step toward curbing excessive punishments. But it is telling that, when we do "business as usual" with millions of people flowing in and out of prisons and jails each year, there is ordinarily little public consideration of our policy approaches to enhancing public safety.

## VIII.  INTERNATIONAL COMPARISONS

The vast use of long-term sentences in the U.S. is an anomaly by international standards,[69] and in line with the position of the United States broadly as a world leader in its use of incarceration. Sentence lengths in most European nations, either by law or practice, rarely exceed twenty years.[70] Perhaps the most compelling evidence in this regard is the prison term of twenty-one years imposed on Norwegian Anders Breivik, the ultra-right terrorist who killed seventy-seven people one day in 2011—mostly youths attending a political camp.[71] Under Norwegian law, the maximum prison term is twenty-one years, which can be extended for five-year terms if the prisoner is deemed to still pose a risk to public safety.[72] Contrast this policy with sentencing laws in the U.S., where it is not

---

[69] *See* Lee, *supra* note 1.

[70] *See* JUSTICE POL'Y INST., FINDING DIRECTION: EXPANDING CRIMINAL JUSTICE OPTIONS BY CONSIDERING POLICIES OF OTHER COUNTRIES 2-3 (2011); *see also* MARC MAUER & ASHLEY NELLIS, THE MEANING OF LIFE: THE CASE FOR ABOLISHING LIFE SENTENCES (The New Press, forthcoming 2018).

[71] Catherine Appleton, *Lone Wolf Terrorism in Norway*, 18 INT'L J. HUMAN RIGHTS 127, 127-142 (2014).

[72] *See* Mark Lewis & Sarah Lyall, *Norway Killer Gets the Maximum: 21 Years*, N.Y. TIMES, Aug. 25, 2012, at A3.

128                           *UMKC LAW REVIEW*                      [Vol. 87:1

unusual for a repeat drug seller who has not engaged in violence to receive a comparable prison term.

The most substantial sentencing contrast between the U.S. and other nations (in addition to our use of the death penalty) concerns life imprisonment. While 161,000 individuals are serving life with or without parole in the U.S., such sentences are an aberration in many nations. Norway abolished life sentences in 1981[73]; in Denmark and Sweden, lifers can be released after twelve years and eighteen years of imprisonment, respectively.[74]

It is not only European nations that reject the imposition of life sentences. In Latin America, only six of nineteen nations maintain statutes that permit life imprisonment, though in many jurisdictions prison terms can be so lengthy that they constitute *de facto* life terms.[75] There is also the practice of the International Criminal Court, which tries cases of war crimes, genocide, and crimes against humanity. The Court has no provision for sentences of life without parole and, for those cases in which a life sentence is imposed, there is a requirement for review after twenty-five years.[76]

Within the U.S., the American Law Institute ("ALI") adopted its revised Model Penal Code in 2017. The Code's standards line up with the American Bar Association in calling for a length of incarceration that is "no longer than needed to serve the purposes for which it is imposed."[77] Regarding long sentences, the ALI concludes that "terms for single offenses in excess of twenty years are rarely justified on proportionality grounds, and are too long to serve most utilitarian purposes."[78]

## IX. A REFORM AGENDA

Of the record number of people serving life prison terms in the United States, 6,720 are serving a federal life sentence, with more than half of those (3,861) serving life without parole.[79] These sentences produce diminishing returns for public safety, are far out of line with practices of comparable nations and divert resources from more constructive interventions for public safety.

Challenging the status quo and reducing the scale of these policies is a substantial undertaking, but as the previously described history suggests, there is reason to believe that such shifts are politically viable and can be accomplished without compromising public safety.

---

[73] Tapio Lappi-Seppälä, *Life Imprisonments and Related Institutions in the Nordic Countries*, in LIFE IMPRISONMENT AND HUMAN RIGHTS 461, 472 (Dirk van Zyl Smit & Catherine Appleton eds., 2016).
[74] *Id.* at 467.
[75] *See* Beatriz López Lorca, *Life Imprisonment in Latin America*, in LIFE IMPRISONMENT AND HUMAN RIGHTS 43, 43 (Dirk van Zyl Smit & Catherine Appleton eds., 2016).
[76] *See* Marie Gottschalk, *No Way Out? Life Sentences and the Politics of Penal Reform*, in LIFE WITHOUT PAROLE: AMERICA'S NEW DEATH PENALTY? 227, 251 (Charles J. Ogletree, Jr. & Austin Sarat eds., 2012).
[77] MODEL PENAL CODE § 6.06 (AM. LAW INST., Proposed Final Draft 2017).
[78] *Id.* at § 6.06 note on penultimate maximum penalties.
[79] *See* Nellis, *supra* note 30.

AD-13

MANSOOR ARBABSIAR #65807-054

Federal Correctional Complex
Yazoo City Medium
P.O. Box 5000
Yazoo City, N



U.S. POSTAGE PAID
FCM LG ENV
YAZOO CITY, MS
39194
MAR 22, 21
AMOUNT
$0.00
R2304N118553-02

1000

10037

U.S. District Court
Southern District
U.S. Courthouse
Clerk of the court
500 Pearl Street
New York, NY 1000