# ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP

Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

FRANKLIN A. ROTHMAN

JEREMY SCHNEIDER

ROBERT A. SOLOWAY

DAVID STERN

——————

RACHEL PERILLO

Tel: (212) 571-5500
Fax: (212) 571-5507

March 7, 2025

**By ECF**

Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

***United States v. Manssor Arbabsiar*, 11 Cr. 897 (LGS)**
**(Manssor Arbasbsiar's Letter Motion for Compassionate Release)**

Dear Judge Schofield:

Manssor Arbabsiar respectfully requests that the Court reduce his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and the First Step Act of 2018.

Mr. Arbabsiar is 70 years old with various health problems. He already has completed nearly 14 years of a 25-year sentence, having pled guilty for his part in planning the murder of the Saudi Arabian ambassador to the United States. His current release date is March 5, 2033, when he will be 78 years old.

We respectfully ask that the Court reduce Mr. Arbabsiar's sentence to time served. As discussed below, several independent reasons exist that warrant the requested sentence reduction. They include: (i) Mr. Arbabsiar being no danger to anyone if released; (ii) the goals of federal sentencing having all been met here; (iii) Mr. Arbabsiar's age; (iv) his multiple health problems that are better addressed outside of prison; (v) his unduly harsh conditions of confinement; and (vi) Mr. Arbabsiar's willingness to renounce his U.S. citizenship and be immediately deported to Iran upon completion of his sentence.

**DISCUSSION**

This Court "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the [sentencing] factors set forth in [§ 3553(a)] to the extent that they are applicable, if it finds that – (i) extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." First Step Act of 2018, § 603(b), Pub. L. No. 115–391, 132 Stat. 5194, 5239 (codified at § 3582(c)(1)(A)(i)).[1] The "applicable policy statement" codified at U.S.S.G. § 1B1.13, authorizes a sentence reduction if "extraordinary and compelling reasons warrant the reduction" and "[t]he defendant is not a danger to the safety of any other person or to the community."

Notably, the examples of appropriate reasons provided in the § 1B1.13 policy statement are illustrative, not exhaustive. This Court has the independent power and judicial authority, apart from the Sentencing Commission or Bureau of Prisons, to determine what constitutes "extraordinary and compelling reasons" for release. *See, e.g., United States v. Haynes*, 2020 WL 1941478, *11–15 (E.D.N.Y. Apr. 22, 2020) (so ruling, and collecting cases); *United States v. Rodriguez*, 2020 WL 1627331, *2–6 (E.D. Pa. Apr. 1, 2020) (same). As held by the Second Circuit, "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." *United States v. Brooker*, 976 F.3d 228, 237-238 (2d Cir. 2020). Likewise, the Court has broad discretion in fashioning appropriate relief. It may, for example, "reduce but not eliminate a defendant's prison sentence *or* end the term of imprisonment but impose a significant term of probation or supervised release in its place." *Id*. (emphasis added).

As in all sentencing matters the Court's discretion in determining whether to grant compassionate release is "broad." *Brooker*, 976 F.3d at 237. "Where no single factor alone may justify release, the total circumstances may still rise to the level of extraordinary and compelling reasons for release." *United States v. Resto*, 2021 WL 1109467, *2 (S.D.N.Y. Mar. 23, 2021); *United States v. Tellier,* 2023 U.S. Dist. LEXIS 149994, (S.D.N.Y. Aug. 25, 2023) (Schofield, J.) (finding that "while Defendant's extraordinary rehabilitation, harsh prison conditions and lengthy

---

[1] While § 3582(c)(1)(A)(i) ordinarily requires that a defendant first exhaust all administrative remedies before filing a motion for compassionate release, the exhaustion provision is non-jurisdictional, subject to waiver, and properly waived here given the urgency of Mr. Arbabsiar's age and medical conditions. *See, e.g., United States v. Russo*, 2020 WL 1862294, *3–7 (S.D.N.Y. Apr. 14, 2020) (Liman, J.) (analyzing exhaustion issue; concluding that court "can grant the requested relief on its own authority, given the extraordinary circumstances here, and because doing so would not be inconsistent with congressional intent"); *United States v Haney*, 2020 WL 1821988, *1-4 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (same; "Congressional intent not only permits judicial waiver of the 30-day exhaustion period," but "actually favors such waiver" in appropriate circumstances where it would allow "courts to deal with the emergency before it is potentially too late"); *United States v. Smith*, 2020 WL 1849748, *2-4 (S.D.N.Y. Apr. 13, 2020) (Keenan, J.) (same; "the First Step Act did not empower the Government with the sole authority to decide when and under what conditions exhaustion may be waived," and agreeing that "judicial waiver is permissible"); *United States v. Sawicz*, 2020 WL 1815851, *2 (E.D.N.Y. Apr. 10, 2020) (Ross, J.) (same; waiving exhaustion requirement because the "delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences").

imprisonment would alone be insufficient, together they present an extraordinary and compelling reason for Defendant's sentence reduction"). *See also United States v. Tellier*, 2022 WL 1468381, *5 (S.D.N.Y. May 10, 2022) (same); *United States v. Fisher*, 493 F. Supp. 3d 231, 235-236 (S.D.N.Y. 2020) (finding that the sum of defendant's age, health conditions, particularized COVID-19 risk, and exceptional rehabilitation efforts constituted extraordinary and compelling reasons).

Here, several reasons, taken separately and certainly together, support Mr. Arbabsiar's immediate compassionate release from prison.

### A. The Court Should Grant Compassionate Release Because Mr. Arbabsiar Poses No Threat or Danger to Others

U.S.S.G. § 1B1.13(a)(1) requires that Manssor not be "a danger to the safety of any other person or to the community." This requirement is easily met here.

Mr. Arbabsiar was born to a middle-class family in Iran in 1955 and had a normal childhood. He came to the United States in 1977 on a student visa and has lived here ever since, settling in Texas, marrying his wife, Martha Guerrero, and raising a son, John, with whom he maintains a loving relationship. Prior to this case he had never been convicted of a crime. Rather, for more than 35 years, he lived a quiet, law-abiding life, working in real estate and automobile sales. He had no interest or involvement in Middle Eastern or Iranian politics, was not religious, and had absolutely no involvement in terrorism, international intrigue, or anything of the sort, until his aberrational involvement in this offense.

One of the enduring conundrums of this case is why a person like Mr. Arbabsiar, with no prior criminal record and no financial or political incentive, would participate in such a serious crime. The answer lies, at least in part, in his mental state. While it is not claimed that these conditions amount to a defense or impact his competence, they do provide what appears to be the only explanation for his behavior. When approached by his cousin, a high-ranking Iranian official, he felt flattered to be trusted by such a powerful person. He was not offered any financial incentive to engage in this crime, nor was he offered a position in Iran. Instead, it appears that his sole motivation was his wish to impress his cousin, This bizarre and irrational motive is consistent with his wife's belief, backed by the opinion of medical professionals, that Manssor was suffering from an undiagnosed and untreated mental health issue – specifically, Bipolar II disorder – which was worsened at the time of the offense by the recent deaths of his father and his best friend in 2010.[2]

The apotheosis of this irrational behavior occurred shortly before Manssor was arrested,

---

[2] After the offense, psychiatrist Dr. Michael B. First, consulting with neuropsychologist Dr. Joel Morgan, diagnosed Mr. Arbabsiar as suffering from Bipolar II Disorder, and Manssor began receiving necessary treatment. Dr. Michael B. First is a Professor of Clinical Psychiatry at Columbia University, a Research Associate Psychiatrist at the New York State Psychiatric Institute, and the Editor of the *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* (DSM-IV-TR), which is the American Psychiatric Association's manual for diagnosing mental disorders, and essentially the Bible for psychiatric diagnosis. A copy of Dr. First's Psychiatric Report and CV were submitted as part of the sentencing proceedings.

when he tried to go to Mexico to serve as human collateral for the promised payment to the putative hit man.  Although advised by his Iranian contact not to go, Manssor tried to go to Mexico anyway. This dangerous decision in just one illustration of the irrationality and swings between extreme mania and depression that drove his participation in the whole criminal enterprise.  On his way to Mexico to act as human collateral, Arbabsiar was turned back, arrested, and jailed.

Once he received treatment for his bipolar condition, Manssor recognized the harm that could have resulted and, deeply remorseful for his actions, immediately provided whatever information he could to the government and then timely pled guilty pursuant to a plea agreement.

The aberrational nature of his offense, and the plain fact that Manssor poses no threat to anyone, is further illustrated by his adjustment to his incarceration. During his 14 years of imprisonment, Mr. Arbabsiar has only received four disciplinary violations. All were minor, with the last one taking place in April 2021, almost four years ago. His violations consist of the following: (1) in June 2013, he was sanctioned for refusing to obey an order; (2) in February 2015, he was sanctioned for allowing another inmate to use his phone in return for cheaper rates; (3) in June 2015, he was sanctioned for allowing another inmate to help him work on the computer; and (4) in April 2021 he was sanctioned for threatening his brother-in-law with bodily harm while arguing with him over the phone. (A copy of Mr. Arbabsiar's Inmate Disciplinary Record is attached hereto as **Exhibit A**.)

Outside of these four relatively minor violations, Mr. Arbabsiar has been a model inmate. I have spoken with both his counselor, Officer Longino, and his unit manager, Officer Hinton. Both characterize Manssor as an inmate who is easy to work with and who causes no problems. Overall, he presents a picture of a person who regrets his actions, has accepted the consequences of those actions, and is determined not to reoffend or waste his remaining time and opportunities. Plainly, Mr. Arbabsiar poses no threat to anyone, or to any community in the United States or Iran.

B.  **The Court Should Grant Compassionate Release Because Doing So Accords with All the Section 3553(A) Factors that Guide Federal Sentencing**

Each of the federal sentencing factors – proportionality, specific and general deterrence, incapacitation, and rehabilitation (see 18 U.S.C. § 3553(a)(2)) – has been met here and support the requested sentence reduction and compassionate release sought by this motion. *See* 18 U.S.C. § 3582(c)(1)(A)(i) (instructing courts to consider the sentencing factors as part of their compassionate release analysis).

Mr. Arbabsiar has spent well over a decade in prison. Even if his motion is granted, he will be released from prison at age 70 and immediately deported from the United States, where he has lived most of his life, to Iran. This punishment is more than sufficient to meet the sentencing goals of specific and general deterrence. Fourteen years and deportation is more than enough to deter Manssor and any others thinking of making the same mistake as him. Indeed, studies have shown that it is the arrest– and Manssor's arrest and prosecution was heavily publicized – that best deters, and not the length of the sentence.[3]

---

[3] *See, e.g.,* Valerie Wright, *The Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, 5-6 (2010), available at

As to proportionality and incapacitation, while Mr. Arbabsiar's crime – soliciting a murder – was extremely serious, 14 years in prison and deportation from the country he has lived most of his life, is proportional to the crime. "By way of comparison, the average federal sentence for murder within the Second Circuit in 2022 was about 19 years." *United States v. Donato*, 2024 WL 1513646, *7 (E.D.N.Y. Apr. 8, 2024).

As to rehabilitation, while "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason," the "rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." U.S.S.G. § 1B1.13(d). Here, Mr. Arbabsiar's rehabilitation should be considered by the Court in support of reducing his sentence and releasing him from federal prison so he can obtain the medical care and help he needs and live what remains of his life with his family in Iran.

In a letter to the Court, Mr. Arbabsiar accepts responsibility for his offense and details his efforts at rehabilitation:

> I will be seventy (70) years old this March, and have taken many classes during my incarceration, which I believe will assist me upon my release, and cause me to be a better son, dad, and grandad. … I have an outstanding institutional record and have not had a shot in over four (4) years, and the staff speak well of me as I get along with them all. … I have an outstanding institutional post rehabilitation record, as I have taken the liberty to use my time wisely in furthering my education as well as learning about the way things work on the streets to make sure I can be a productive citizen. Although I am well up in age and may not require employment, in the event probation request that I obtain employment, I will be ready to meet this requirement due to the classes I have taken.

Letter from Manssor Arbabsiar to Court (attached hereto as **Exhibit B**).

The contents of Mr. Arbabsiar's letter is echoed in letters of support from three inmates, all of whom describe Manssor's positive role as a father figure who helps them do the right things (*see* **Exhibit C**), and by a letter of recommendation from B. Gunn, Mr. Arbabsiar's Factory Manager in FCC Yazoo City - Medium, where Manssor is currently incarcerated (see **Exhibit D**).

Manssor has been employed by Federal Prison Industries/UNICOR for since 2018, where he is an ACU Operator in the ACU-OCP Trouser Department making military uniforms and clothing. Mr. Gunn informs the Court:

---

http://www.antoniocasella.eu/nume/Wright_2010.pdf; Brian Jacobs, "*The Cost of Affording Deterrence*," Forbes (Nov. 16, 2021) (to achieve the aim of general deterrence, "social science conclusively finds that certainty matters more than severity"), available at https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affordingdeterrence/?sh=6f89752 77bd4; U.S. Department of Justice, *Five Things About Deterrence*, National Institute of Justice (May 2016) ("Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment."), available at https://www.ojp.gov/pdffiles1/nij/247350.pdf.

Manssor has been employed by UNICOR since November 2018 thru current date. His employment trajectory is reflective of the motivation to rehabilitate and improve to incorporate back into society. During this time period inmate Arbabsiar has been observed demonstrating the following: respectful communications with UNICOR staff members, arrives on time for work, shows initiative to effectively complete his daily operations as ACU – Operator in the ACU OCP Trouser Department, which directly affects the factory output flow for production, and he communicates well in training inmates. We have had no incidents with him and appreciate his skills as an ACU Operator in eh ACU OCP Trouser Department.'

Letter from B. Gunn (**Exhibit E**).

Mr. Arbabsiar's strong record of growth and rehabilitation while in prison weighs heavily in favor of finding extraordinary and compelling circumstances. See, e.g., *United States v. Ramirez*, 571 F. Supp. 3d 40, 50-52 (S.D.N.Y. 2021) (granting compassionate release motion where defendant completed significant number of hours of accredited programs and committed four minor infractions while incarcerated).

### C. The Court Should Grant Compassionate Release Given Mr. Arbabsiar's Age

U.S.S.G. § 1B1.13 expressly identifies age as an extraordinary and compelling reason warranting a reduction in sentence:

Age of the Defendant. The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. § 1B1.13(b)(2). Mr. Arbabsiar meets all three of the conditions set by the policy statement. He is 70 years old; he is physically and mentally infirm because of the aging process; and he has served over 10 years in prison. In this regard, Manssor suffers from progressive memory loss, a condition that was first diagnosed in 2016. *See* Medical Records, attached hereto as **Exhibit F**.

That "age" is an explicit reason for reducing a sentence makes perfect sense. Mr. Arbabsiar is significantly older than most of the inmates with whom he is held because people "age out" of crime. This fact is well-established and accepted by the Courts and the United States Sentencing Commission. *See, e.g.*, *United States v. Turner*, 629 F. App'x 66, 68 (2d Cir. 2015) (recognizing that "a defendant's older age may indicate a decreased likelihood of recidivism"); *United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010) (same); *United States v. Klump*, 2025 U.S. Dist. LEXIS 36557 (W.D.N.Y. Feb. 28, 2025) (granting compassionate release to 57 year old defendant who "is less likely to pose a danger, given that defendants in their fifties have lower recidivism rates than younger defendants"); United States Sentencing Commission Report, *The Effects of Aging on Recidivism Among Federal Defendants* (March 2017) (available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

The U.S.S.C. Report is instructive. It found that older offenders were "substantially less

likely" than younger offenders to recidivate following release. *Id.* at p. 3 (Key Findings). Specifically, only "13.4 percent of offenders aged 65 or older at the time of release were rearrested compared to 67.6 percent of offenders younger than age 21 at the time of release." *Id.* This pattern "was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration declined as age increased." *Id.* Moreover, this already low recidivism rate dropped even lower for offenders like Mr. Arbabsiar in Criminal History Category I. *Id.* (finding that for "offenders in Criminal History Category I, the rearrest rate ranged from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders aged 60 or older"). Finally, older offenders who did recidivate were generally arrested for "public order" and other minor and non-violent crimes, as compared to younger offenders who were more likely to commit an assault or other form of violence. *Id.* The findings in the U.S.S.C. Report are fully supported by the results of other studies. *See, e.g.*, Kyung Yon Jhi & Hee-Jong Joo, *Predictors of Recidivism Across Major Age Groups of Parolees in Texas*, JUST. POLICY J., Spring 2009 (finding virtually no recidivism for those released at age 60 or older), available at https://www.cjcj.org/media/import/documents/predictors_of.pdf; Timothy Hughes et al., *Trends in State Parole*, 1999-2000, BUREAU.JUST.STAT.SPECIAL.REP.(Oct.2001) (finding that prisoners released at 55 years or older recidivate at a rate of just 2 percent), available at http://www.bjs.gov/content/pub/pdf/tsp00.pdf. *See also* Letter from B. Gunn (Ex. F) (noting that "inmates who work in prison industries were 24 percent less likely to recidivate than non-program participants, and 14 percent more likely to be gainfully employed").

### D. The Court Should Grant Compassionate Release Given Mr. Arbabsiar's Ill Health

U.S.S.G. § 1B1.13 states that "extraordinary and compelling reasons" include "suffering from a serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility from which he or she is not expected to recover" (§1B1.13(b)(1)(B)) or "suffering from a medical condition that requires … specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death" (§1B1.13(b)(1)(C)).

Mr. Arbabsiar's medical condition fits squarely within this policy statement and is an extraordinary and compelling reason for ordering his release. (*See* Medical Records **Exhibit F**). Emotionally, Mr. Arbabsiar continues to suffer from anxiety disorder and episodic mood disorders of the type associated with being bipolar. Mentally, he has been dealing with memory loss since 2016. Physically, cataracts in both eyes mean he is unable to see and has difficulty moving around the prison or properly caring for himself. In one eye, his vision is now 20/400, which is tantamount to blindness. He also has high blood pressure, atherosclerosis, chronic Stage 3 kidney disease, gastric ulcers, and onset diabetes, all of which require a level of care and attention which is not provided in prison. In this regard, the Bureau of Prisons has been unable or unwilling to treat or arrest these progressive conditions. And, even if, for example, cataract surgery is finally scheduled and actually takes place, the BOP will be unable to provide the exacting care that is required to ensure that no permanent or life-threatening complications or infections result.

Mr. Arbabsiar currently sits in prison with impaired vision, impaired memory, and chronic illnesses which all go untreated and make his sentence more onerous than for the usual younger inmate. Compassionate release is called for so he may receive proper treatment and maximize his remaining years.

**E. The Court Should Grant Compassionate Release Given Mr. Arbabsiar's Unduly Harsh Conditions of Confinement**

Mr. Arbabsiar has been imprisoned for 14 years. He was in MCC-New York from September 2011 to May 2013. He was then sent to Lewisberg, then Marion Illinois, and is now incarcerated in the federal penitentiary in Yazoo City, Mississippi.

In each of these prisons, Mr. Arbabsiar's conditions of confinement have been unduly harsh. He has never been visited by his family, and, given his age, he has few peers with whom he can associate. Further, much of his prison time has been spent in the Special Housing Unit or other conditions tantamount to solitary confinement. Thus, for almost two years, he was held in a unit in MCC where he was not allowed to speak with anyone other than prison personnel, had limited showers and exercise, and was only allowed to make phone calls to approved parties that were monitored in real time. Likewise, Mr. Arbabsiar was held in the SHU his entire stretch at Lewisberg.

"[C]onfining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane." *United States v. Chavez*, 710 F. Supp. 3d 227, 233 (S.D.N.Y. 2024) (citing *Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari), *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring), and *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441-43 (3d Cir. 2020)). The deleterious effects of lockdowns and solitary or near-solitary confinement, even for a relatively short period, are well-researched and well-known. *See, e.g., Williams v. Sec'y Pennsylvania Dep't of Corr*., 848 F.3d 549, 566 (3d Cir. 2017) (Solitary confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term damage. . . There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects.") (and multiple studies cited); *Miller ex. rel. Jones v. Stewart*, 231 F.3d 1248, 1252 (9th Cir.2000) ("[I]t is well accepted that conditions such as those present in [solitary confinement] ... can cause psychological decompensation to the point that individuals may become incompetent.").[4] Unlike other inmates, Mr. Arbabsiar has spent much of the last 14 years in solitary confinement-like conditions, enduring its particularly harmful and deleterious effects.

Moreover, Mr. Arbabsiar had to endure the terrible chaos and appalling prison conditions engendered by the COVID epidemic, which increased violence, ended or reduced educational, social, and medical services, led to widespread and long-term lockdowns, and worsened every aspect of prison life. Even some years later, the prison system has not recovered from the impact of the epidemic upon it, and Manssor is continuing to suffer improperly harsh conditions as the prison system remains widely and negatively impacted by the endemic breakdowns of the COVID

---

[4] *See also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 332 (2006) ("Grassian"); Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 500 (1997); Craig Haney, *Mental Health Issues in Long-term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 130-141 (2003) (describing SHU syndrome and the long-term effects of solitary confinement on prison inmates)); Grassian at 333–45 (2006) (same).

years.[5] The breakdown of the prison system is another reason to grant Mr. Arbabsiar compassionate release. As this Court held in *Tellier*:

> Although the harsh conditions of confinement also, on their own, do not constitute extraordinary and compelling reasons, courts have recognized that the pandemic made "incarceration harsher and more punitive than would otherwise have been the case." *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020); *see also United States v. Rengifo*, 569 F. Supp. 3d 180, 197 (S.D.N.Y. 2021) (finding that the "unanticipated severity" of lockdown conditions "constitutes another circumstance that" in combination with other factors "collectively amounts to an extraordinary and compelling reason for early release"). Here, in addition to harsh conditions that Defendant experienced prior to the pandemic, Defendant has most recently endured extended lockdowns and suspended or limited access to visitors such as family members and attorneys and to rehabilitative, therapeutic, religious and recreational programs. Defendant is sixty-three years old and has a serious, chronic heart condition. These factors weigh in favor of finding extraordinary and compelling reasons.

*Tellier,* 2023 U.S. Dist. LEXIS 149994, at *11-12. The same circumstances that led the Court to grant compassionate release for Mr. Tellier apply here and support compassionate release for Mr. Arbabsiar.

The Court should reduce Mr. Arbabsiar's sentence in recognition of the obvious – that each day he has and will serve in prison will be far more punitive than a normal day in jail and more punitive than was ever intended. *See, e.g., United States v. Ray Par*, 2024 U.S. Dist. LEXIS 151228, *12-13 (S.D.N.Y. Aug. 22, 2024) (describing inhumane conditions at MCC and MDC and stating that "Courts in this Circuit recognize that the harsh conditions of confinement at the area's jails counsel in favor of a shorter overall sentence"). As Judge Rakoff put it: "In effect, you are serving harder time every day you are in the federal prisons." *United States v. Cirino*, 19 Cr. 323 (JSR) (July 17, 2020); *see also United States v. Garcia*, 20 Cr. 27 (JGK) (July 10, 2020) (explaining that "imprisonment contemplated by the guidelines would be imprisonment under normal circumstances, but [pandemic-era] imprisonment has been anything but normal circumstances."); *United States v. Martinez*, 18 Cr. 669 (JPO) (observing that time spent in the

---

[5] *See generally, The story so far: AP's investigation into federal prisons*, AP News (May 5, 2022), available at https://apnews.com/article/covid-health-crime-prisons-only-on-apc7a1cfc4aee226570c375fc015ee322f. *See also United States v. Boyd*, 21-CR-486 (SHS) (S.D.N.Y.), ECF No. 74 (2/3/22 Opinion and Order refusing to detain defendant at either MDC or Essex because of overcrowding in both facilities from closure of other jails and continued breakdown in their conditions due to COVID); https://www.nydailynews.com/2024/03/30/maggot-infested-meals-being-served-inmates-at-brooklyn-federal-jail-lawyers-say/; *United States v. Chavez*, 710 F. Supp. 3d 227, 235-236 (S.D.N.Y. 2024) (observing that, two years after the pandemic ended, the physical conditions at MD-Brooklyn continue to include mold, contaminated drinking water, broken lights, broken emergency call buttons, "severe staffing shortages" and unaddressed violence that leaves inmates in dire conditions and perpetual fear); *United States v. Colucci*, 743 F. Supp. 3d 452, 458 (E.D.N.Y. 2024) (finding that in late 2024 it remained true that "[c]haos reigns [at the MDC], along with uncontrolled violence." (citing *United States v. Griffin*, 2024 WL 2891686, *3 (E.D.N.Y. Jume 10, 2024)).

MCC during COVID was equivalent to 1.5 to 2 times the normal time).

When the Court considered all § 3553(a) factors in 2013, it could not have envisioned COVID, or that Mr. Arbabsiar would serve many years of his sentence enduring such terrible conditions, even as he remained a model prisoner. Nor, in issuing its advisory guidelines, could the Sentencing Commission have ever intended for Mr. Arbabsiar to spend his sentence in such appalling and pervasively dangerous conditions. That he has been forced to do so provides another reason to grant him compassionate release.

**F. The Court Should Grant Compassionate Release Given That Mr. Arbabsiar Has Agreed to Deportation Following Release**

Mr. Arbabsiar has resided in this country for the past 48 years and built a life and family here. Nevertheless, he is willing to renounce his United States citizenship and be deported to Iran at the conclusion of his sentence, a consequence that will help ensure that he will not reoffend.

That Mr. Arbabsiar can be successfully deported to Iran is not mere speculation. Attached hereto as **Exhibit G** is a March 27, 2023 letter from the Interests Section of the Islamic Republic of Iran (Embassy of Pakistan) confirming that, upon his request and release from United States custody, the Iranian government "will issue the necessary travel papers to Mr. Arbabsiar so he can return to Iran." The Court should grant Mr. Arbabsiar release from U.S. custody and allow him to live the rest of his life in Iran. *See, e.g., United States v. Patterson*, 2024 U.S. Dist. LEXIS 215375, *5-7 (S.D.N.Y. Nov. 21, 2024) (finding it "significant" that Patterson was subject to removal from United States to Jamaica upon completion of sentence; granting compassionate release and releasing defendant "solely to ICE custody").

**CONCLUSION**

Mr. Arbabsiar's significant rehabilitation, his age, his ill health, and his willingness to renounce his United States citizenship, considered separately and in combination establish extraordinary and compelling reasons warranting early release, while fulfilling the sentencing goals of § 3553(a). For all the foregoing reasons, Mansoor Arbabsiar respectfully requests that the Court (i) grant his motion for reduction of sentence and compassionate release; (ii) order his immediate release from prison and transfer to ICE custody for deportation to Iran; and (iii) grant him such other and further relief as the Court deems just and proper.

Respectfully submitted,

*David Stern*

David Stern